UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
File No.:

| | |
|---|---|
| DEAMONTE WHITE, | |
| Plaintiff, | |
| v. | **COMPLAINT** (Jury Trial Requested) |
| DELTA PROTECTION AGENCY, LLC, d/b/a/ DELTA COMPANY POLICE & PROTECTION AGENCY, | |
| Defendant. | |

COMES NOW the Plaintiff, DEAMONTE WHITE ("Plaintiff"), by and through his undersigned attorneys, and hereby files this Complaint for damages and other legal and equitable relief from Defendant, DELTA PROTECTION AGENCY, LLC, d/b/a DELTA COMPANY POLICE & PROTECTION AGENCY ("Defendant"), for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*., 42 U.S.C. § 1981, and state law.

## NATURE OF THE CASE

1. This is an action brought by Plaintiff, an African American, seeking damages from Defendant, a private security company, for unlawful discrimination, including disparate treatment, hostile work environment, retaliation, and wrongful discharge.

2. Plaintiff was employed as a security guard and primarily conducted security patrols in residential neighborhoods. During his employment, Plaintiff was subjected to discriminatory treatment by his direct supervisor, who repeatedly denied him access to company vehicles for use during security patrols, a benefit routinely granted to similarly situated White employees. In addition, Plaintiff's direct supervisor repeatedly directed

1

racial slurs toward Plaintiff and referred to other individuals using racial slurs in Plaintiff's presence.

3. Despite Plaintiff's complaints, Defendant, having previously failed to implement, communicate, or provide training on any formal anti-discrimination and/or anti-harassment policies, failed to take any remedial action. As a result of persistent discrimination, threats, and Defendant's inaction, Plaintiff was constructively discharged and/or terminated.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.*, as amended, and (iii) 42 U.S.C. §§ 1981 *et seq.*, as amended.

5. This Court's supplemental jurisdiction is invoked by 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form a part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper in this Court in as much as the unlawful employment practices occurred in this judicial district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendant maintains offices and conducts business in this district.

## PARTIES

7. Plaintiff is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, a resident of North Carolina.

8. Plaintiff is an African American male.

9. At all times relevant, Plaintiff was employed by Defendant. Throughout his employment, Plaintiff was required to perform several security patrols in residential neighborhoods throughout Charlotte, North Carolina.

10. Upon information and belief, Defendant is a domestic limited liability company operating under the laws of the State of North Carolina and doing business in and around Charlotte, North Carolina.

11. Defendant's principal place of business is located at 301 West Fleming Drive, Morganton, NC 28655.

12. Defendant is a "person" within the meaning of § 701 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

13. Defendant engages in an industry affecting commerce and, upon information and belief, employs more than fifteen (15) persons. Thus, Defendant is an "employer" within the meaning of § 701 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

14. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging disparate treatment and hostile work environment based on race.

15. Defendant appeared and participated in the EEOC's investigation. Defendant's then-counsel submitted a position statement on behalf of Defendant on June 1, 2023.

16. During the investigation, Plaintiff submitted a timeline, which included claims of retaliation, particularly that Plaintiff reported his supervisor's discriminatory conduct, and was later constructively discharged.

17. In its Letter of Determination dated April 15, 2025, the EEOC stated as follows:

> The investigation revealed that [Plaintiff] was subjected to ongoing harassment from his supervisor by being subjected to unwelcome racial comments. [Defendant's] upper management failed to take corrective action to address [Plaintiff's] complaints of harassment. The investigation revealed that the Charging Party had engaged in protected activity. Evidence supports that [Plaintiff's] work environment was sufficiently severe to warrant constructive discharge. Based on the evidence obtained in the Commission's investigation, it is reasonable to conclude that [Plaintiff] was subjected to discriminatory harassment based on his race and retaliated[1] against in the form of constructive discharge, in violation of Title VII of the Civil Rights Act.

18. On April 25, 2025, Plaintiff received his Notice of Right to Sue from the EEOC.

## STATEMENT OF FACTS

19. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

20. Defendant is a security agency that provides a variety of protection services, including uniformed and/or armed officers, security patrols, and customized security solutions for businesses, construction sites, and events in several locations throughout North Carolina.

21. At all relevant times, Richard Epley ("Chief Epley") was Defendant's owner and manager.

22. Chief Epley, in his capacity as Defendant's owner and manager, possessed and exercised the necessary authority to act on behalf of Defendant. This authority included but was not

---

[1] "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can be reasonably expected to follow the charge of discrimination. *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981). Further, as long as "plaintiff's claims in [his] judicial complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in [his] subsequent civil suit." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000).

limited to, making decisions, implementing policies, and undertaking actions central to the allegations contained herein. Such authority was vested in Chief Epley by virtue of his position as owner and manager. Therefore, Chief Epley's actions and/or decisions in his capacity as owner and manager are attributable to Defendant.

23. At all relevant times, Defendant employed a Sergeant named Billy Dillingham ("Mr. Dillingham").

24. Mr. Dillingham, in his capacity as Sergeant, possessed and exercised the necessary authority to act on behalf of Defendant. This authority included but was not limited to, making decisions, implementing policies, and undertaking actions central to the allegations contained herein. Such authority was vested in Mr. Dillingham by virtue of his position as Sergeant. Therefore, Mr. Dillingham's actions and/or decisions in his capacity as Sergeant are attributable to Defendant.

25. At all times relevant, Mr. Dillingham was Plaintiff's direct supervisor.

26. At all relevant times, Defendant employed a Dispatch Supervisor and Administrator Assistant ("DSAA") named Christy Farris ("Ms. Farris").

27. Upon information and belief, Ms. Farris served as Defendant's human resources professional and was responsible for receiving and processing complaints and reports of discrimination from Defendant's employees.

28. Ms. Farris, in her capacity as a DSAA and human resources professional, possessed and exercised the necessary authority to act on behalf of Defendant. This authority included but was not limited to, making decisions, implementing policies, and undertaking actions central to the allegations contained herein. Such authority was vested in Ms. Farris by virtue of her position as a DSAA and human resources professional. Therefore, Ms. Farris'

actions and/or decisions in her capacity as a DSAA and human resources professional are attributable to Defendant.

29. Upon information and belief, Defendant either does not maintain a formal anti-discrimination and/or anti-harassment policy, or, in the alternative, has failed to effectively communicate, implement, and provide training on such a policy to its employees, including Mr. Dillingham and Ms. Farris.

30. On or about June 17, 2022, Plaintiff, an African American male, commenced employment with Defendant as a security guard. During his employment, Plaintiff primarily performed security patrols in residential neighborhoods throughout Charlotte, North Carolina.

31. At all times, Plaintiff satisfactorily performed his job at a level that met Defendant's legitimate expectations. Plaintiff never received a negative performance review, write-up, or negative feedback.

32. Upon information and belief, Defendant maintained a fleet of marked company vehicles designated for use by employees in the performance of their duties, including security patrols in residential neighborhoods.

33. Mr. Dillingham, as Sergeant and Plaintiff's direct supervisor, exercised authority and control over who could utilize the company vehicles.

34. Throughout Plaintiff's employment and despite multiple requests to use a company vehicle, Mr. Dillingham refused to permit Plaintiff to utilize a company vehicle while performing patrols. Instead, Plaintiff was required to use his personal vehicle, resulting in out-of-pocket expenses for fuel and vehicle maintenance. Additionally, this practice subjected Plaintiff to increased risk, as he was required to conduct patrols in an unmarked, personal vehicle, potentially compromising his safety.

35. Upon information and belief, Mr. Dillingham granted White employees access to company vehicles for use during their shifts throughout the duration of Plaintiff's employment. In contrast, Mr. Dillingham initially denied Black employees access to company vehicles. On or about April 12, 2023, after Plaintiff was constructively discharged, Queen City News published an article highlighting Defendant's discriminatory practices toward Plaintiff, as further detailed herein. Upon information and belief, following the publication of the article, Defendant began permitting Black employees to use company vehicles while on duty.

36. In addition to the discriminatory vehicle assignment practices described hereinabove, Mr. Dillingham made several discriminatory comments towards Plaintiff throughout Plaintiff's employment.

37. In mid-January 2023, Plaintiff and Mr. Dillingham were on duty and responded to a noise complaint about a pool party. After the two responded, Mr. Dillingham stated to Plaintiff "its always the 'niggers' that cause issues." Mr. Dillingham further stated to Plaintiff "you should know about that."

38. On or about January 23, 2023, Mr. Dillingham referred to Plaintiff as "colored boy." On several other occasions, Mr. Dillingham referred to Plaintiff as "kid."

39. On or about the same date, Plaintiff reported Mr. Dillingham's conduct to Ms. Farris and Chief Epley.

40. Plaintiff was scheduled to meet with Chief Epley and Ms. Farris on or about January 24, 2023, at Defendant's office in Morganton to discuss Mr. Dillingham's conduct.

41. At approximately 11:00 PM on January 23, 2023, while Plaintiff was stationed at work, Mr. Dillingham approached Plaintiff's vehicle and confronted Plaintiff. Referring to the

upcoming meeting between Plaintiff, Chief Epley, and Ms. Farris, Mr. Dillingham stated that Plaintiff "better not go up there if he knew what was good for him."

42. Plaintiff believed that only he, Chief Epley, and Ms. Farris had knowledge of the meeting as he had not disclosed it to anyone else. When Plaintiff later asked Ms. Farris how Mr. Dillingham had learned of the meeting, she admitted that she informed Mr. Dillingham of Plaintiff's complaints and expressed that she did not want Mr. Dillingham to get into trouble.

43. During the meeting on January 24, 2023, Chief Epley told Plaintiff that Chief Epley would not hear "he said, she said" and that Plaintiff would have to "deal with it[,]" referring to Mr. Dillingham's conduct and racially inflammatory comments.

44. Defendant failed to take any remedial action to address Mr. Dillingham's discriminatory behavior.

45. On or about March 27, 2023, Mr. Dillingham approached Plaintiff again and confronted him about the meeting Plaintiff had had with Chief Epley regarding his discriminatory conduct.

46. On or about the same day, Plaintiff requested permission from Mr. Dillingham to use a company vehicle for residential patrols, as Plaintiff's personal vehicle was experiencing mechanical issues and was inoperable.

47. Mr. Dillingham denied Plaintiff's request to use the company vehicle.

48. Because Plaintiff was unable to drive his car or a company vehicle, Plaintiff was forced to miss two days of work.

49. When Plaintiff complained about being denied access to a company vehicle despite his personal vehicle's condition, Ms. Farris and Chief Epley informed him that he would be

reassigned to work in Morganton. However, Plaintiff would have to drive over an hour and a half to get to Morganton from his home, and due to his vehicle's mechanical issues, Plaintiff was unable to travel that far at that time.

50. Defendant again failed to take any action to address Mr. Dillingham's discriminatory behavior.

51. In light of (1) the severity of Mr. Dillingham's conduct, (2) Defendant's inaction regarding Mr. Dillingham's conduct, (3) the continued presence of Mr. Dillingham as Plaintiff's supervisor, and (4) the lack of any indication that the discriminatory conduct would cease, Plaintiff felt he had no reasonable option but to resign.

52. On or about April 2, 2023, Plaintiff emailed Ms. Farris outlining Mr. Dillingham's ongoing discriminatory conduct and Defendant's failure to take corrective action. Plaintiff further stated that he "felt unsafe to continue working with the continuous harassment and racial remarks from [his] supervisor." *See* **Exhibit A.**

53. On or about the same day, Mr. Dillingham texted Plaintiff "Hey kid u finally quit I told you I had more power than you that [I] am the freaking head poncho in university[.]" He then followed with another message, stating "Kid I told you coloreds don't drive ford Tauruses so why did you ask about driving a company car the Chief also can't afford it he is losing a lot of money in gas for these cars kid[.]" *See* **Exhibit B.**

54. On or about the same day, Plaintiff responded to Mr. Dillingham asking, "Why do you keep calling me colored[?]" Mr. Dillingham responded, "Kid I have told you over and over [I] am the head poncho in university what I say goes." *See* **Exhibit B.**

55. Defendant characterized Plaintiff's constructive discharge as a "voluntary" resignation. After Plaintiff had been constructively discharged, Plaintiff attempted to gain clarification

on Defendant's characterization of Plaintiff's discharge as "voluntary." In response, Chief Epley told Plaintiff "you were terminated."

**FIRST CAUSE OF ACTION**
**Violations of Title VII, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981**
**Race Discrimination—Disparate Treatment**

56. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

57. Plaintiff may establish a prima facie case of disparate treatment by demonstrating: "(1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action[,]" *Cosby v. S.C., Parole & Pardon Servs.*, 93 F.4th 707, 728 (4th Cir. 2024); and (4) plaintiff suffered the adverse action "under circumstances giving rise to an inference of unlawful discrimination." *Bryant v. Aiken Reg'l Med. Ctrs.*, Inc., 333 F.3d 536, 545 (4th Cir. 2003) (quoting *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998)).

58. Disparate treatment claims may be brought under § 1981, and the elements of a prima facie case of disparate treatment under § 1981 are the same as those for a Title VII claim. *See Gairola v. Virginia Dep't of General Services*, 753 F.2d 1281 (4th Cir. 1985).

59. As an African American, Plaintiff belongs to a statutorily protected category.

60. Plaintiff was qualified for his job. Additionally, as evidenced by his lack of negative performance reviews or feedback, Plaintiff, in all respects, was performing his job in a manner that was consistent with Defendant's legitimate business expectations.

61. Plaintiff suffered adverse employment action each time his supervisor, Mr. Dillingham, refused to allow Plaintiff to use a company vehicle to perform patrols in residential neighborhoods.

62. Mr. Dillingham's refusal adversely affected the terms, conditions, and/or benefits of Plaintiff's employment. Specifically, Plaintiff was required to use his unmarked personal

vehicle to patrol neighborhoods, resulting in (1) out-of-pocket expenses for fuel and vehicle maintenance, (2) increased safety risk to Plaintiff, and (3) missed days at work when Plaintiff's personal vehicle was inoperable such that Plaintiff was unable to perform patrols.

63. Plaintiff suffered additional adverse action when he was constructively discharged and/or terminated as described more particularly hereinbelow.

64. These adverse employment actions were taken with discriminatory intent as evidenced by Mr. Dillingham's racially derogatory comments, particularly text messages indicating that Mr. Dillingham did not allow Plaintiff to drive the company vehicle because "coloreds don't drive ford Tauruses."

65. Mr. Dillingham's discriminatory intent is also evidenced by his preferential treatment of White employees. Plaintiff and other Black employees were treated differently than similarly situated employees outside of their protected class as White employees were permitted to use company vehicles while on duty.

66. Defendant repeatedly failed to take corrective action after Plaintiff reported Mr. Dillingham's conduct.

67. Moreover, upon information and belief, Defendant either does not maintain formal anti-discrimination and/or anti-harassment policies, or, in the alternative, failed to effectively communicate, implement, and provide training on such policies to its employees, including Mr. Dillingham. As a result of this failure, Defendant effectively permitted Mr. Dillingham to engage in discriminatory conduct and allowed such conduct to continue even after it was reported.

68. As a direct and proximate result of said unlawful employment practices described herein, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory, and other damages to be determined at a trial of this matter.

**SECOND CAUSE OF ACTION**
**Violations of Title VII, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981**
**Race Discrimination—Hostile Work Environment**

69. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

70. A plaintiff is subjected to a racially hostile work environment in violation of Title VII when "there is (1) unwelcome conduct; (2) that is based on plaintiff's [. . .] race; (3) which is sufficiently severe *or* pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (2011) (emphasis added).

71. A hostile work environment claim may be brought under 42 U.S.C. 1981, and the elements for a claim of hostile work environment are the same under § 1981 as they are under Title VII. *See Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369 (2004); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001).

72. As an African American, Plaintiff belongs to a statutorily protected category.

73. Plaintiff was subjected to repeated and offensive behavior from his direct supervisor throughout the course of several months, including (1) refusal to allow Plaintiff to use the company vehicle, which caused Plaintiff to suffer out of pocket expenses and increased Plaintiff's safety risk while at work, and (2) use of deeply offensive and derogatory slurs, including "colored boy" and "nigger."

74. Plaintiff reported Mr. Dillingham's behavior to Chief Epley, Defendant's owner, and Ms. Farris, Defendant's DSAA and human resources professional, on multiple occasions. In

response, Chief Epley told Plaintiff to "deal with it" and ultimately failed to take corrective action.

75. Additionally, after Plaintiff reported Mr. Dillingham's conduct, Ms. Farris warned Mr. Dillingham, so as not to get Mr. Dillingham in trouble. In response, Mr. Dillingham subjected Plaintiff to threats and further harassment.

76. Mr. Dillingham subjected Plaintiff to said unwelcome conduct for several months, throughout the time in which Mr. Dillingham supervised Plaintiff.

77. Mr. Dillingham's conduct was based on Plaintiff's race as evidenced by Mr. Dillingham's racially derogatory statements and repeated actions in denying Plaintiff use of company vehicles while treating White employees more preferentially.

78. Mr. Dillingham's conduct persisted throughout Plaintiff's employment until he was ultimately constructively discharged and/or terminated.

79. The discriminatory harassment was so severe or pervasive as to alter the conditions of Plaintiff's employment and create an abusive and hostile atmosphere.

80. As evidenced by Plaintiff's repeated complaints, Plaintiff actually perceived his work environment to be intimidating, unwelcoming, offensive, and hostile. Moreover, given the repeated and severe nature of the conduct, a reasonable person would perceive the environment to be abusive and hostile.

81. Ultimately, Mr. Dillingham's conduct culminated to a tangible employment action, particularly Plaintiff's constructive discharge and/or termination as described hereinbelow, such that Defendant is strictly liable for Mr. Dillingham's harassing conduct.

82. Plaintiff suffered a constructive discharge and/or termination as follows:

a. Mr. Dillingham took deliberate actions to make Plaintiff's working conditions intolerable as more particularly described herein. Similarly, Chief Epley's "deal with it" response and Ms. Farris' actions in informing Mr. Dillingham of Plaintiff's complaints made Plaintiff's working conditions intolerable.

b. Plaintiff's working conditions were in excess of those faced by other, White employees, such that a reasonable employee in Plaintiff's position would have felt compelled to resign.

c. As evidenced by Plaintiff's complaints via text and email, Plaintiff's working conditions were actually intolerable in that he felt "unsafe" and had no choice but to resign.

d. Further, when Plaintiff attempted to gain clarification from Chief Epley on Defendant's characterization of Plaintiff's discharged as "voluntary," Chief Epley told Plaintiff "you were terminated." Chief Epley's characterization of Plaintiff's discharge as a termination indicates Chief Epley's (1) awareness of hostile and coercive conditions and (2) intent to compel Plaintiff's resignation.

83. Defendant is also liable for conduct that may not have culminated to a tangible employment action, but nevertheless created an intimidating, unwelcoming, and hostile work environment. Particularly, Defendant (1) warned Mr. Dillingham about Plaintiff's complaints, resulting in threats toward Plaintiff; (2) failed to take corrective action after Plaintiff reported Mr. Dillingham's conduct on multiple occasions; and (3) upon information and belief, did not maintain formal anti-discrimination and/or anti-harassment policies, or, in the alternative, failed to effectively communicate, implement, and provide training on such policies to its employees, including Mr. Dillingham. As a result of this

failure, Defendant effectively permitted Mr. Dillingham to engage in discriminatory conduct and allowed such conduct to continue unchecked.

84. As a direct and proximate result of said unlawful employment practices described herein, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory, and other damages to be determined at a trial of this matter.

### THIRD CAUSE OF ACTION
### Violations of Title VII, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981
### Retaliation

85. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

86. To establish a prima facie case of Title VII retaliation, a plaintiff must demonstrate the following: (1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal link between the protected activity and adverse action. *DeMasters v. Cariliion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015).

87. A retaliation claim may be brought under 42 U.S.C. 1981, and the elements for a claim of retaliation are the same under § 1981 as they are under Title VII. *See CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 449 (2008); *see also Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004).

88. Plaintiff engaged in protected activity by complaining to his superiors and Defendant's human resources professional about the issues alleged herein, including suspected violations of Title VII.

89. Plaintiff was retaliated against when (1) Defendant attempted to reassign Plaintiff to Morganton, which was an hour and a half drive for Plaintiff, (2) Mr. Dillingham threatened

Plaintiff after Plaintiff reported Mr. Dillingham's conduct, and (3) Defendant constructively discharged and/or terminated Plaintiff.

90. Plaintiff suffered the adverse actions described herein because he reported his concerns of suspected violations of Title VII to his superiors and Defendant's human resources professional.

91. Defendant's adverse actions would be likely to dissuade a reasonable employee from participating in protected activity.

92. Further, upon information and belief, Defendant either does not maintain formal anti-discrimination and/or anti-harassment policies, or, in the alternative, failed to effectively communicate, implement, and provide training on such policies to its employees, including Mr. Dillingham. As a result of this failure, Defendant effectively permitted retaliation against Plaintiff.

93. Moreover, Chief Epley's characterization of Plaintiff's discharge as a termination indicates Chief Epley's (1) awareness of hostile and coercive conditions and (2) intent to compel Plaintiff's resignation.

94. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

### FOURTH CAUSE OF ACTION
### Wrongful Discharge as Against Public Policy

95. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

96. Pursuant to N.C.G.S. § 143-422.2(a), it is the public policy of the State of North Carolina "to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color,

national origin, age, sex or handicap by employers which regularly employ 15 or more employees."

97. Defendant regularly employees more than fifteen (15) employees.

98. Plaintiff was an at-will employee of Defendant.

99. As an African American, Plaintiff belongs to a statutorily protected category.

100. Plaintiff also engaged in legally protected activity by reporting race discrimination on multiple occasions.

101. Plaintiff was subjected to discriminatory conduct, hostile work environment, and retaliation as set forth more particularly hereinabove.

102. Despite Plaintiff's job qualifications as previously described herein, Defendant ultimately constructively discharged and/or terminated Plaintiff as described more particularly hereinabove.

103. This adverse employment action was taken based on discriminatory reasons as previously set forth herein. Moreover, Plaintiff was treated differently from similarly situated employees outside of his protected class as described more particularly hereinabove.

104. The conduct alleged hereinabove violates N.C.G.S. § 143-422.2(a).

105. As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, compensatory damages, and other damages to be determined at a trial of this matter.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

1. That the Court empanel a jury to hear his cause;

2. A judgment declaring that the practices complained of herein are unlawful and in violation of both Title VII and § 1981.

3. All damages which Plaintiff has sustained because of Defendant's conduct, including backpay, front pay, benefits, general and specific damages for lost compensation, and job benefits he would have received but for Defendant's unlawful employment practices, and for emotional distress, humiliation, embarrassment, and anguish;

4. Exemplary and punitive damages in an amount commensurate with Defendant's ability and to deter future discriminatory conduct;

5. Award Plaintiff the costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs;

6. Pre-judgment and post-judgment interest, as provided by law;

7. That the Court retain jurisdiction over Defendant until such time as the Court is satisfied that Defendant has remedied the practices complained of herein and is determined to be in full compliance with the law; and

Plaintiff also seeks injunctive relief, including, but not limited to:

8. Training regarding the prohibition against retaliation for engaging in protected activity for all of Defendant's supervisors.

9. Training of all employees regarding discrimination, including disparate treatment and hostile work environment.

10. Supervisory discipline up to and including termination for any employee who engages in discrimination based upon race.

11. Monitoring by the Court or a federal agency to ensure that Defendant complies with all injunctive relief; and

12. Granting Plaintiff other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Respectfully submitted,

This the 23rd day of July, 2025.

**Burts Law, PLLC**

*/s/ M. Anthony Burts II*
M. Anthony Burts II
*/s/ Kathryn Roseman*
Kathryn Roseman
PO Box 102
Newton, NC 28658
T. (704) 751-0455
F. (704) 413-3882
anthony@burtslaw.com
katie@burtslaw.com
*Attorneys for Plaintiff*

**Hall & Dixon, PLLC**

*/s/ Ronard Dixon, Jr*
Ronard Dixon, Jr
725 East Trade Street, Suite 115
Charlotte, NC 28202
T. (704) 993-6825
F. (704) 626-2620
rcdixon@halldixonlaw.com
*Attorney for Plaintiff*